[Cite as *Orchard v. Ohio Dept. of Natural Resources*, 2011-Ohio-5991.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

MICHAEL ORCHARD,

      Plaintiff/Counter Defendant,

      v.

OHIO DEPARTMENT OF
  NATURAL RESOURCES,

      Defendant/Counter Plaintiff.

Case No. 2009-08349

Judge Clark B. Weaver Sr.
Magistrate Lewis F. Pettigrew

MAGISTRATE DECISION

{¶1} Pursuant to Civ.R. 53, Magistrate Lewis F. Pettigrew was appointed to conduct all proceedings necessary for decision in this matter.

{¶2} Plaintiff brought this action alleging breach of contract. Defendant, Ohio Department of Natural Resources (ODNR), filed an answer and counterclaim seeking damages for trespass and for the destruction of trees on public property. The issues of liability and damages were not bifurcated and the case proceeded to trial on both issues.

{¶3} In 2006, plaintiff became interested in purchasing a residence near Rocky Fork State Park on the shore of the lake. There is no dispute that the shoreline is owned by the state and managed by ODNR. Sometime in December 2006 or January 2007, plaintiff spoke with ODNR employee Billie Leath regarding the boat dock licensing process. Shortly after speaking with Leath, in January 2007, plaintiff purchased a residence on Valarie Drive in Hillsboro for $280,000.

{¶4} Although plaintiff purchased the home as a primary residence, he was an active duty member of the armed services and spent much of his time in Japan. Consequently, the residence served primarily as a summer destination for plaintiff and his family. Plaintiff testified that he relied upon the seller's representation that he could lease two private docks each year pursuant to ODNR's "Cluster Dock Program."

According to plaintiff, the availability of two cluster docks during the boating season was an important aspect of the transaction inasmuch as plaintiff owned a set of WaveRunner watercraft and he intended to use them extensively in the summer months.

{¶5} ODNR delivered and installed two cluster docks on the shore of plaintiff's property in April 2007. Plaintiff subsequently purchased two attachable WaveRunner docks at a total cost of $5,000. Plaintiff was permitted to affix the WaveRunner docks to the two wooden cluster docks which allowed him to have ready access to the WaveRunners.

{¶6} In March 2007, plaintiff received dock license renewal forms from ODNR in the regular mail. On March 2, 2007, plaintiff remitted the appropriate fee for two boat dock licenses, $350 per dock, for a total of $700. Plaintiff testified that on March 2, 2007, Leath provided him a copy of ODNR's cluster dock manual (Plaintiff's Exhibit 8) and discussed some of the rules.

{¶7} Plaintiff also signed a document titled "mowing permit" on that date and, according to plaintiff, he and Leath discussed the history of the mowing permit program and an infamous homeowner violation of the permit known as the "bulldozer incident." Plaintiff testified that Leath also informed him that reasonable trimming of trees and shrubs along the established path from his property to the lake shore was permitted.

{¶8} On or about April 1, 2007, ODNR installed boat docks for the 2007 summer season. Plaintiff attached two WaveRunner docks to the end of the wooden cluster docks to accommodate his two WaveRunners. Plaintiff purchased these specialty docks at a cost of $2,500. According to plaintiff, he and his family enjoyed the use of the two cluster docks throughout the summer of 2007.

{¶9} Plaintiff claims that in the summer of 2007 he discussed with an ODNR police officer by the name of Jamie Harless such subjects as the cluster dock program, the bulldozer incident, and the extent of trimming that could be done pursuant to the

mowing permits. According to plaintiff, he came away from that conversation with the impression that tree and shrub trimming on ODNR property was permitted.

{¶10} In the fall of 2007, plaintiff hired an independent contractor to trim branches and trees between his house and the lake.  Plaintiff could not recall the name of this individual but he described him as an Amish man whom he had met at a local hardware store.  Plaintiff walked his property with the contractor describing what he wanted to be trimmed.  Plaintiff claims that the man agreed to perform the work for cash payments at 10-12 dollars per hour.[1]

{¶11} The evidence establishes that in the fall of 2007 and winter of 2008, substantial and extensive tree-trimming was performed on the ODNR property between plaintiff's residence and the lake shore.  Plaintiff was in Japan during this time.

{¶12} On March 10, 2008, plaintiff completed the 2008 cluster dock application and remitted renewal fees of $350 per dock, for a total of $700.  Later in the month, ODNR employee Mark Lockhart was advised that his maintenance staff was unable to install plaintiff's boat docks because of the number of dead tree branches in the area.  Over the next few days, Lockhart and several members of his "management team" including Jeff Boester, Jon Dobney, Tammy Meesler, and John Hunter visited the property and had meetings about the matter and it was agreed that ODNR police officer Tom Cassity would be assigned to investigate the encroachment issue.  On March 26, 2008, Cassity and Boester made a video recording of the tree damage on the property. (Defendant's Exhibit A–admitted without sound.)

{¶13} In April 2008, plaintiff called the Rocky Fork State Park office on three or four occasions regarding installation of boat docks for the 2008 season but he did not receive any return phone call.  On April 29, 2008, plaintiff spoke with Officer Cassity by phone.  When Cassity told plaintiff of the investigation about tree cutting, plaintiff admitted that the trees were trimmed at his direction and he offered to pay for any

---

[1] In fall 2007, the cluster docks along with WaveRunner docks were removed by ODNR for winterization and storage.

damages; that he just wanted his boat docks to be installed. At that point in time, plaintiff was in Japan and had not seen the extent of the damage.

{¶14} On May 22, 2008, plaintiff met with Cassity and Lockhart at a Rocky Fork State Park office where Cassity laid out the evidence he had gathered regarding the encroachment. Once again, plaintiff offered to pay for the damage and requested the delivery of his docks. Plaintiff testified that he became frustrated with ODNR's refusal to install his docks or to give him any answers.

{¶15} On May 22, 2008, Officer Cassity completed his investigation and began to search for an arborist to assess the damage. Plaintiff's two cluster docks were never delivered and plaintiff's WaveRunner docks were not returned.[2]

{¶16} In January 2009, the decision was made to deny plaintiff any future boat dock license. Leath was subsequently instructed not to send plaintiff the forms he needed to renew his boat dock licenses in 2009.

{¶17} In the complaint, plaintiff alleges that he was entitled to two cluster docks in the 2008 season pursuant to the license agreement with ODNR. The 2008 license agreement provides in relevant part:

{¶18} "This license is valid for the period beginning on April 1, 2008 and ending on November 1, 2008 for the following watercraft: 8' KAWASAKI JET SKI, with the OH #.

{¶19} "The licensee is subject to all laws and rules of the State of Ohio, the Division of Parks and Recreation and to the provisions set forth in this license, including stipulations, as follows:

{¶20} "* * *

{¶21} "5. The State of Ohio, Division of Parks and Recreation, shall have the right to terminate this license without cause assigned by giving in writing to the licensee 24 hours notice prior to such termination. In such event the licensee shall be entitled to

a prorata refund of rental paid; provided, further, that no refund shall be made if termination of this license is due to the licensee's violation of any laws or rules or provisions set forth in the stipulations of this license or failure to comply with any condition stipulated herein.

**{¶22}** "* * *

**{¶23}** "This license may be renewed annually through the year, during the 31-day period between March 1 and March 31; otherwise the option to renew is cancelled without further notice. After the year, this license will terminate without further notice. Subsequent dock licenses will be granted annually on the basis of a lottery of all qualified applicants."[3]

**{¶24}** On March 26, 2009, Lockhart received a phone call from plaintiff regarding his licence renewal whereupon Lockhart informed plaintiff that he would not get a license. On April 3, 2009, plaintiff received written notice of revocation from Jon Dobney.

**{¶25}** A license in respect to real estate is "a permission to do some act or series of acts on the land of the licensor, without having permanent interest in it." *Fairbanks v. Power Oil Co.* (1945), 81 Ohio App. 116, 123; see also *Yeager v. Tuning* (1908), 79 Ohio St. 121. "A licensee has no right to the continued existence of a license. The licensor may at any time revoke this license without compensating the licensee." *Norwood v. Forest Converting Co.* (1984), 16 Ohio App.3d 411, 418.

**{¶26}** It was abundantly clear to the court upon hearing the testimony presented by the respective parties that plaintiff was willing to pay whatever monetary damages ODNR demanded of him so long as he could recover his cluster dock privileges, but that ODNR personnel were so infuriated by plaintiff's trespass that they were unwilling to deliver plaintiff docks for the 2008 season and, absent a change of heart, unwilling to grant plaintiff a cluster dock license for 2008 or in the future.

---

[2]In May 2011, approximately two weeks before trial, plaintiff's WaveRunner docks were returned to him.
[3]The 2008 license for plaintiff's second dock contains the same operative language.

{¶27} To the extent that plaintiff seeks the return of his $700 payment, the language of the 2008 license states that "no refund shall be made if termination of this license is due to the licensee's violation of any laws or rules or provisions set forth in the stipulations of this license or failure to comply with any condition stipulated herein."

{¶28} The evidence shows that plaintiff violated Ohio Adm.Code 1501:41-3-10 which provides in relevant part: "Except by permit issued for scientific or educational purpose by the chief of the division, no person shall willfully or negligently pick, dig up, cut, mutilate, destroy, injure, disturb, move, molest, alter, treat, burn, or carry away any tree or plant or portion thereof, including but not limited to leaf mold, flowers, foliage, berries, fruit, grass, turf, humus, shrubs, cones, and dead wood, except in a specific area where the chief has authorized and has posted at the headquarters of such area notification of such authorization * * *."

{¶29} The weight of evidence establishes that a substantial area of ODNR property was damaged by plaintiff's contractor. In addition to numerous mal-pruned trees, there were many trees that were topped and others that were felled. Although plaintiff denies that any trees were removed from the site, it is clear from what remains that some trees were harvested. Plaintiff claims that much of the damage occurred during winter storms and there is evidence of some such damage at the site. However, it is clear from the photographic, videotape, and testimonial evidence, that a violation of the above cited administrative code provision was committed and that plaintiff is the responsible party.

{¶30} Thus, plaintiff is entitled to no refund of his $700 payment.

{¶31} Plaintiff argues that pursuant to the plain language of the 2008 agreement, once the license is executed, ODNR may terminate such license only upon prior written notice to plaintiff. In other words, according to plaintiff, written notice is required under the license agreement whether the termination is for cause or otherwise. As noted above, no such written notice was provided to plaintiff until April 2009, well after the

expiration of the 2008 license period. ODNR's failure to provide plaintiff with written notice of its intention to terminate the license constitutes a breach of the license agreement. The question now becomes: what are plaintiff's damages?

{¶32} Although plaintiff testified credibly that using the public docks was not a meaningful option for him and that the ability to participate in the cluster dock program was the primary reason he purchased the property, plaintiff is not entitled to an award of damages either for the loss of use and enjoyment of his property or for diminished value inasmuch as ODNR was not a party to the real estate contract. Additionally, while ODNR retained possession of plaintiff's WaveRunner docks during the pendency of this dispute, there is no evidence that plaintiff demanded the return of the docks prior to filing suit or that plaintiff was otherwise damaged by the dispossession. Accordingly, there shall be no recovery for such loss, if any.

{¶33} However, upon a finding of breach of an agreement, "the law infers damages, and if none are proved, nominal can be recovered." *First Natl. Bank of Barnesville v. Western Union Tel. Co.* (1876), 30 Ohio St. 555, 568. In this case, the evidence justifies an award of nominal damages in the amount of $700.

{¶34} With regard to plaintiff's demand for a cluster dock license in the future, plaintiff's reliance upon the seller's representations that he was entitled to the docks on a continuing basis is unsupported either by the language of the 2008 license agreement, ODNR's "Rocky Fork Cluster Dock Manual," or the prevailing law. Under Ohio law, the issuance of the cluster dock license is completely within the discretion of ODNR. Thus, plaintiff has failed to demonstrate any right either in law or in equity to a cluster dock license in the future.

{¶35} Turning to the counterclaim, plaintiff argues that the mowing permit issued to him by ODNR in the summer of 2008, in combination with certain oral representations made to him by Leath and an unidentified ODNR police officer, authorized trimming and pruning of trees on ODNR property. The permit provides in relevant part:

{¶36} "The above named individual (hereinafter referred to as the Permittee) is an adjacent (abutting) landowner, and is herewith being issued a Mowing Permit for the next two calendar years only.

{¶37} "In order to obtain permission from the State of Ohio to mow state-owned property that abuts Permittee's property, Permittee agrees to all of the following provisions:

{¶38} "1.  All land affected by this Mowing Permit is public property, and will remain open at all times for use by the public.

{¶39} "2.  The State of Ohio grants the Permittee the authority to mow only the property that has been mowed in previous years, as shown on the attached illustration. This illustration will be provided by the Permittee.  In addition to the illustration, a photographic representation of the area to be mowed will be provided to the State of Ohio.  Park Management reserves the right to review and alter either the illustration or photographic representation, so that either one properly represents the area that the Permittee is being authorized to mow.  The Permittee may also mow a six (6) foot wide path to the water's edge for dock access, if the Permittee has a current dock license.

{¶40} "* * *

{¶41} "4.  Encroachment(s) and/or failure to comply with requests to remove encroachment(s) will result in the termination of this Mowing Permit and possible citation for violation of laws and rules.

{¶42} "5.  * * * cutting or pruning trees; * * * Any violation of this provision will result in the termination of this Mowing Permit and possible citation for violation of laws and rules * * *."

{¶43} Although the mowing permit authorizes tree trimming and pruning in some small measure, plaintiff's contention that the tree trimming performed on the property was authorized by the mowing permit is simply unreasonable given the location and extent of the damage.  Plaintiff's alternative contention that certain statements made to

him by ODNR employees either expanded the scope of the permit or acted as an estoppel upon ODNR with respect to tree trimming is also unreasonable given the clear prohibition expressed in the permit. The testimony also fails to convince the court that any of the employees to which such statements were attributed had the authority to bind ODNR either in law or in equity. Moreover, even plaintiff has acknowledged that the extent of the trimming and pruning performed by his contractor was in excess of what he intended.

{¶44} "In cases involving trespass to real property that results in the removal of trees or other vegetation, a landowner is entitled to recover reasonable restoration costs, plus the reasonable value of the lost use of the property between the time of the injury and the restoration." *Hartman v. Ohio Dept. of Transp.,* Franklin App. No. 08-AP-599, 2009-Ohio-469, ¶7. "[D]iminution in value is a factor that may be considered in determining whether restoration costs are reasonable, but is not itself an element of damages that must be considered." Id., citing *Martin v. Design Constr. Servs., Inc.*, 121 Ohio St.3d 66, 2009-Ohio-1.

{¶45} On September 10, 2008, Officer Cassity contacted Alan Bunker requesting his services in valuing the damage to the trees. Bunker obtained his bachelor's degree in forest science from Colorado State University. He is not a licensed arborist but he is certified by the American Society of Consulting Arborists.

{¶46} On September 18, 2008, Bunker visited the property with two park officials and took some photographs. He returned to the site on October 30-31, 2008, and walked the property in a pattern of parallel lines while marking trees that were damaged, noting their species, and their trunk diameter. Employing a method known as the Depreciated Replacement Value (DRV), Bunker assessed the monetary damage to ODNR for mal-pruned trees at a present value of $15,015.00. He did not recommend replanting any of the trees. He also acknowledged that he had not been to the property since 2008, and did not know the extent to which trees had regenerated.

{¶47} Plaintiff presented the expert testimony of Registered Consulting Arborist Christian Allen.  Allen visited the property on July 20, 2010, to assess damage. Employing the Cost of Cure method, Allen estimated the present value of the labor necessary to return the property to an aesthetically similar condition was $6,560.  Allen advocated the removal of approximately 10 trees, extensive pruning, and the removal of suckers.  He did not believe that the DRV method of valuation was appropriate in an unmanaged area of forest such as this.

{¶48} In the opinion of the court, Allen's method of valuation provided the best estimate of the damage to ODNR property.  The court believes that the cost of purchasing new trees to replace those that were mal-pruned is simply not a reasonable measure of the damage in the affected area.  Although the damage was extensive, the area has never been considered a managed forest, ODNR has not replanted any trees, and it has acknowledged that it does not intend to remove the damaged trees and replace them with new trees.  The court also notes that the regrowth that has occurred since 2008, as evidenced by the more recent photographs of the area, and the regrowth that will likely occur in the future, will eventually approach the aesthetic that existed prior to the mal-pruning.  The more recent photographs show substantial regrowth in less than two full growing seasons, and the court is convinced that a much better aesthetic can be achieved if the trimming and repruning advocated by Allen is undertaken.

{¶49} In consideration of all the evidence, the court finds that Allen's estimate of $6,560 represents reasonable compensation to ODNR for restoration costs.

{¶50} To the extent that ODNR seeks treble damages pursuant to statute, R.C. 901.51 provides:

{¶51} "No person, without privilege to do so, shall recklessly cut down, destroy, girdle, or otherwise injure a vine, bush, shrub, sapling, tree, or crop standing or growing on the land of another or upon public land.

{¶52} "In addition to the penalty provided in section 901.99 of the Revised Code, whoever violates this section is liable in treble damages for the injury caused."

{¶53} The court does not find that plaintiff acted recklessly in this case. The evidence establishes that plaintiff harbored a mistaken belief that some pruning was permitted on ODNR property and he instructed an individual contractor to prune trees; that plaintiff failed to supervise the work; and that a relatively egregious destruction of the forest canopy occurred as a result of plaintiff's misconduct. While such conduct is a failure of due care, the evidence does not support a greater degree of culpability. Accordingly, judgment shall be for plaintiff as to this count of the counterclaim.

{¶54} Based upon the foregoing, plaintiff has proven a breach of the license agreement and it is recommended that he be awarded nominal damages for such breach in the total amount of $700. Plaintiff's remaining claims are without merit. ODNR has proven that plaintiff committed a trespass upon ODNR's real property and an award in the amount of $6,560 is recommended on the counterclaim.

{¶55} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____
LEWIS F. PETTIGREW
Magistrate

Case No. 2009-08349 - 12 - MAGISTRATE DECISION

cc:

Adam H. Karl
Keith E. Golden
923 East Broad Street
Columbus, Ohio 43205-1101

Tara Paciorek
Assistant Attorney General
2045 Morse Road, #D-2
Columbus, Ohio 43229

Emily M. Simmons
Stephanie D. Pestello-Sharf
Assistant Attorneys General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

Filed October 6, 2011
To S.C. reporter November 18, 2011